Lewis "Toby" TYLER, Plaintiff,

v.

CITY OF MANHATTAN, Defendant.

Civ. A. No. 93–4030–DES.

United States District Court,
D. Kansas.

April 18, 1994.

Larry J. Leatherman, Palmer & Lowry, Topeka, KS, for plaintiff.

James S. Pigg, Kurt A. Level, Fisher, Patterson, Sayler & Smith, Topeka, KS, William L. Frost, Morrison, Frost and Olsen, Manhattan, KS, for defendant.

### MEMORANDUM AND ORDER

SAFFELS, Senior District Judge.

This matter is before the court on the motion of the defendant City of Manhattan for summary judgment (Doc. 28), and the cross-motion of the plaintiff for summary judgment (Doc. 31).

Plaintiff Lewis "Toby" Tyler ("Tyler") seeks declaratory, injunctive, and monetary relief against the City of Manhattan ("City") under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"). Count I of his complaint claims that the City has violated the ADA by failing to complete an accept-able self-evaluation as required by 28 C.F.R. § 35.105 and by failing to adopt an acceptable transition plan as required by 28 C.F.R. § 35.150(d). Count II alleges that the City has subjected plaintiff to discrimination by failing to carry out its obligations to permit him to participate equally in its services, activities, and programs, in particular its recreational programs, city council meetings, and advisory board activities. Count III alleges that the City discriminates against plaintiff on the basis of his disabilities in violation of 28 C.F.R. § 35.130(b)(1) because it licenses liquor stores, taverns, and restaurants that do not make their facilities accessible to him.

### Jurisdiction

Plaintiff asserts jurisdiction under 28 U.S.C. § 1331 and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* This court has jurisdiction notwithstanding the fact that the plaintiff has not exhausted his administrative remedies. *See* 28 C.F.R. Part 35, App. A, Subpart F (Compliance Procedures include private right of action for persons with disabilities, who need not exhaust federal administrative remedies as a prerequisite); *see also Gorsline v. State of Kansas,* No. 93–4254–SAC, slip op. at 5, 1994 WL 129981 (D.Kan. March 4, 1994); *Noland v. Wheatley,* 835 F.Supp. 476, 482–83 (N.D.Ind.1993); *Petersen v. University of Wisconsin Bd. of Regents,* 818 F.Supp. 1276, 1279–80 (W.D.Wis.1993); *cf. Pushkin v. Regents of Univ. of Colorado,* 658 F.2d 1372, 1380–82 (10th Cir.1981) (no exhaustion of remedies prerequisite for filing suit to enforce § 504 of the Rehabilitation Act, 29 U.S.C. § 794).

### Summary Judgment Standards

Under Fed.R.Civ.P. 56, the court is compelled to render summary judgment on behalf of a moving party if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Essentially, the inquiry as to whether an issue is genuine is "whether the evidence

presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). An issue of fact is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510. This inquiry necessarily implicates the substantive evidentiary standard of proof that would apply at trial. *Id.* at 252, 106 S.Ct. at 2512.

The moving party has the burden of showing the absence of a genuine issue of material fact. This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). In opposing a properly supported motion for summary judgment, a party "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. The nonmoving party must go beyond the pleadings and designate specific facts, by affidavits, depositions, answers to interrogatories, and admissions on file, showing that there is a genuine issue for trial. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. at 2552. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514.

The court must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues. *United States v. O'Block,* 788 F.2d 1433, 1435 (10th Cir.1986). The court must also consider the record in the light most favorable to the party opposing the motion. *Bee v. Greaves,* 744 F.2d 1387, 1396 (10th Cir.1984), *cert. denied,* 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985). However, a mere scintilla of evidence in favor of the nonmoving party is insufficient to create a genuine issue of material fact. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

### Facts

For purposes of deciding the pending motions, the court makes the following findings of fact.

Plaintiff is partially paralyzed as a result of a gunshot wound to the head, and he is confined to a wheelchair. The City does not dispute that he is a "qualified individual with a disability" as defined by Title II of the ADA, 42 U.S.C. § 12131(2).[1]

The City is a political subdivision of the state of Kansas. There is no dispute that the defendant is a "public entity" for purposes of Title II of the ADA.[2] The City employs more than 50 persons.

The City appointed a committee ("ADA Committee") to facilitate compliance with the ADA and to identify priorities. The ADA Committee's membership included City employees and persons with disabilities. The ADA Committee met monthly. Plaintiff attended and participated in virtually all its meetings, except during a three to four-week period when he was recovering from a broken hip and arm. Plaintiff contends that the City did not maintain a list of interested parties consulted by the ADA Committee. Although the City concedes that no such formal list was compiled, it contends that the Committee's records include references to all

---

1. For purposes of Title II, the term "qualified individual with a disability" is defined as follows:

   The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2). The term "disability" is defined as follows:

   The term "disability" means, with respect to an individual—
   (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
   (B) a record of such an impairment; or
   (C) being regarded as having such an impairment.

2. *See* 42 U.S.C. § 12131(1)(A) ("public entity" includes any local government).

interested parties, so that such a list could be produced.

Plaintiff regularly attends meetings of the City Commission, held at City Hall. On one occasion in November 1992, plaintiff was unable to attend a City Commission meeting held on the second floor of City Hall, because the elevator was not working. City Commission members were aware that the elevator was not functioning and nevertheless went ahead with the meeting. However, some of the agenda items were deferred to the Commission's next meeting, which the plaintiff attended. City Commission meetings include a time for public comments, when any individual is allowed three minutes to address the Commission. City Commission meetings are televised on the City's cable access channel.

The City timely prepared a self-evaluation for the purpose of complying with ADA's implementing regulations.[3] In preparing the ADA self-evaluation, the City and its ADA Committee reviewed and relied upon the 1984 self-evaluation prepared by the City for the purpose of complying with Section 504 of the Rehabilitation Act of 1973. Plaintiff was not prevented from talking with City personnel regarding the self-evaluation, and in fact submitted comments both verbally and in writing.

Plaintiff asserts that the self-evaluation was inadequate in scope because it did not address all programs, activities, policies, and procedures; and because it did not include streets, sidewalks, parking spaces, and buildings leased by the City. In response, the City contends that all city programs, activities, policies, and practices were evaluated; that the self-evaluation included sidewalks and parking areas adjoining each of the facilities evaluated; and that the ADA does not require evaluation of buildings leased by the

City. The City's ADA self-evaluation is available for public review.

The ADA Committee prioritized each of the evaluated facilities with regard to the need for modifications. Within the time permitted by the ADA and its implementing regulations,[4] the City made a list of some planned structural modifications to existing City buildings and facilities that were deemed necessary in order to comply with the ADA. This list was prepared for the purpose of complying with the regulatory requirement that the City prepare a "transition plan." *See* 28 C.F.R. § 35.150(d).

Plaintiff contends that the City has not adequately complied with the transition plan requirement. Plaintiff contends that the transition plan completed by the City is not broad enough in scope nor complete enough in detail. Further, plaintiff contends that a list of *completed* facility modifications does not exist, and that no place has been designated for public inspection of such a list. The ADA transition plan itself, however, is available for public review.

The City has designated Ron Fehr as the contact person regarding the ADA self-evaluation and the ADA transition plan. The City has adopted a grievance form to be used to initiate grievances related to the City's compliance with the ADA. While plaintiff has never filed such a grievance, he contends that he has tried but was unable to do so.

Plaintiff contends that his visual impairments prevent him from reading notices in the normal written format, and that the City did not offer public notices in any alternative media as required by the ADA. The City does not produce all its documents in alternative media, but will do so upon request. Some city documents, such as City Commission agendas, are available on audiotape at the city library.[5] The plaintiff has not sub-

---

**3.** *See* 35 C.F.R. § 35.105(a).

**4.** *See* 42 U.S.C. § 12134; 42 C.F.R. § 35.-150(d)(1). The regulation requires a public entity employing 50 or more persons to develop a transition plan within six months of January 26, 1992, setting forth the steps necessary to complete structural changes to existing facilities in order to achieve program accessibility. Plaintiff does not contend that the City's transition plan was untimely, but rather that it is incomplete.

**5.** The defendant also contends in response to plaintiff's cross-motion for summary judgment that notices of meetings have been provided in sign language on cable television. As the plaintiff points out in his reply, however, there is no evidence in the record to support the defendant's assertion, and therefore it will not be considered by the court.

mitted any requests to the City for notices or other documents in alternative formats.

The City administers a licensing program for purveyors of cereal malt beverages, including liquor stores.

### Discussion

■ At the outset, the court will address the defendant's argument that the plaintiff's cross-motion for summary judgment was untimely filed. Plaintiff filed his cross-motion for summary judgment on January 10, 1994, together with a supporting memorandum serving as both the plaintiff's opposition to the defendant's motion for summary judgment and plaintiff's memorandum in support of his cross-motion for summary judgment. The pretrial order, filed December 8, 1993, designated December 17, 1993, as the deadline for dispositive motions. Plaintiff has not sought an amendment to the pretrial order pursuant to Fed.R.Civ.P. 16(e). Consequently, plaintiff's cross-motion for summary judgment will be denied as untimely filed.[6] However, the court will consider the arguments raised by the plaintiff in his memorandum in opposition to the defendant's motion for summary judgment.

The City first argues that its self-evaluation and its transition plan meet the minimum requirements of the regulations implementing the ADA.

The ADA itself does not require local governments to initiate self-evaluations or to adopt transition plans. The ADA, however, does direct the Attorney General to promulgate regulations to implement Part A of Title II of the ADA, which generally prohibits discrimination by public entities against qualified individuals with disabilities. *See* 42 U.S.C. § 12134(a).[7]

The regulations promulgated by the Department of Justice to implement Part A of Title II generally require each public entity to conduct a "self-evaluation" as follows:

### § 35.105 Self-evaluation.

(a) A public entity shall, within one year of the effective date of this part, evaluate its current services, policies, and practices, and the effects thereof, that do not or may not meet the requirements of this part and, to the extent modification of any such services, policies, and practices is required, the public entity shall proceed to make the necessary modifications.

(b) A public entity shall provide an opportunity to interested persons, including individuals with disabilities or organizations representing individuals with disabilities, to participate in the self-evaluation process by submitting comments.

(c) A public entity that employs 50 or more persons shall, for at least three years following completion of the self-evaluation, maintain on file and make available for public inspection:

(1) A list of the interested persons consulted;

(2) A description of areas examined and any problems identified;

(3) A description of any modifications made.

(d) If a public entity has already complied with the self-evaluation requirement of a regulation implementing section 504 of the Rehabilitation Act of 1973, then the requirements of this section shall apply only to those policies and practices that were not included in the previous self-evaluation.

Among other things, the implementing regulations also prohibit a public entity from excluding a qualified individual with a disability from participation in its services, programs, or activities or denying such an individual the benefits of its services, programs, or activities, because the entity's *facilities* are inaccessible. *See* 28 C.F.R. § 35.149.

---

6. Accordingly, the Court will not consider the plaintiff's pleading captioned "Reply Memorandum in Response to Defendant's Reply to Plaintiff's Cross–Motion for Summary Judgment and Reply to Defendant's Motion for Summary Judgment" (Doc. 39). Under D.Kan.Rule 206(b), plaintiff may file a response to defendant's summary judgment motion, but he is not entitled to reply to the defendant's reply.

7. Those regulations must be generally consistent with those applicable to recipients of federal financial assistance under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. With regard to program accessibility of existing facilities and communications, the regulations must be consistent with those applicable to federally conducted activities under 29 U.S.C. § 794. *See* 42 U.S.C. § 12134(b).

The transition plan requirement addresses the accessibility of existing facilities, as opposed to new construction. Under 28 C.F.R. § 35.150(a)(1), a public entity need not necessarily make each of its existing facilities accessible. However, the entity's services, programs, and activities must be operated so as to be readily accessible to and usable by individuals with disabilities. 28 C.F.R. § 35.-150(a). This mandate may be met by a variety of means, which may not necessarily include structural changes in existing facilities. 28 C.F.R. § 35.150(b)(1); *see Kinney v. Yerusalim*, 812 F.Supp. 547, 548–49 (E.D.Pa. 1993); *aff'd*, 9 F.3d 1067 (3d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1545, 128 L.Ed.2d 196 (1994).[8] If a public entity elects to make such structural changes in existing facilities in order to achieve compliance, however, and if it employs 50 or more persons, it must develop a "transition plan" setting forth the steps necessary to complete such changes. 28 C.F.R. § 35.150(d).

The regulation sets forth the requirements for the transition plan as follows:

(d) *Transition Plan.* (1) In the event that structural changes to facilities will be undertaken to achieve program accessibility, a public entity that employs 50 or more persons shall develop, within six months of January 26, 1992, a transition plan setting forth the steps necessary to complete such changes. A public entity shall provide an opportunity to interested persons, including individuals with disabilities or organizations representing individuals with disabilities, to participate in the development of the transition plan by submitting comments. A copy of the transition plan shall be made available for public inspection.

(2) If a public entity has responsibility or authority over streets, roads, or walkways, its transition plan shall include a schedule for providing curb ramps or other sloped areas where pedestrian walks cross curbs, giving priority to walkways serving entities covered by the Act, including State and local government offices and facilities, transportation, places of public accommodation, and employers, followed by walkways serving other areas.

(3) The plan shall, at a minimum—

(i) Identify physical obstacles in the public entity's facilities that limit the accessibility of its programs or activities to individuals with disabilities;

(ii) Describe in detail the methods that will be used to make the facilities accessible;

(iii) Specify the schedule for taking the steps necessary to achieve compliance with this section and, if the time period of the transition plan is longer than one year, identify steps that will be taken during each year of the transition period; and

(iv) Indicate the official responsible for implementation of the plan.

(4) If a public entity has already complied with the transition plan requirement of a Federal agency regulation implementing section 504 of the Rehabilitation Act of 1973, then the requirements of this paragraph (d) shall apply only to those policies and practices that were not included in the previous transition plan.

If the public entity undertakes structural changes in existing facilities, such changes must be made "as expeditiously as possible," but no later than January 26, 1995. 28 C.F.R. § 35.150(c).

■ In Count I of his complaint, the plaintiff essentially challenges the adequacy of the City's efforts to comply with the regulation requiring a self-evaluation, and the regulation requiring the City to prepare a transition plan in the event that it elects to make structural changes in existing facilities in order to meet the accessibility mandate of the ADA. Whether or not the City's self-evaluation and transition plan comply with the regulations are essentially questions of law, although the determination of those legal issues depends upon certain underlying facts.

---

**8.** For example, a public entity may comply with the accessibility requirement by relocating services to accessible buildings, by constructing new facilities, or by delivering services by assigning aides to program beneficiaries. The regulations expressly provide that an entity need not make structural changes in existing facilities "where other methods are effective in achieving compliance with this section." 28 C.F.R. § 35.-150(b)(1).

The court has carefully reviewed the City's self-evaluation documents submitted as an exhibit to its motion for summary judgment. The self-evaluation prepared for the purpose of complying with the ADA and its implementing regulations consists of the following:

1. A one-page document listing the programs and services originally evaluated in 1984 as part of the transition plan required by § 504 of the Rehabilitation Act of 1973.[9] The document also states that programs, activities, or services that could be made accessible to the handicapped by non-structural means were deemed to be accessible.

2. A one-page document captioned "ADA Services and Programs Policy," which essentially states the City's policy prohibiting discrimination on the basis of disability, and provides that the policy applies to all City-funded services, programs, and activities. The policy document designates the Department of Human Resources as being responsible for compliance with the ADA.

3. An undated one-page list of city buildings and facilities identified for purposes of the self-evaluation, indicating whether the facility is used by the general public, for programs, or as an employee work center.

4. An undated one-page list of buildings surveyed for purposes of evaluating their physical accessibility. The buildings listed duplicate those in Item 3.

5. Several multi-page self-evaluation checklists prepared in 1984 by recipients of federal housing funds and federal revenue sharing funds.

Plaintiff essentially claims in Count I that the City's self-evaluation does not comply with 28 C.F.R. § 35.105. Pretrial Order, p. 3–4. In its motion for summary judgment, the defendant argues that its self-evaluation appropriately relied upon and adopted the self-evaluation it conducted in 1984 for purposes of complying with § 504 of the Rehabilitation Act of 1973. The City argues that the regulation does not require public entities that have completed Section 504 self-evaluations to complete duplicative evalua-

tions of facilities for purposes of the ADA. Essentially, the City argues that it has met the "minimum" requirements of Title II in performing the required self-evaluation.

■ From the present record, the court is unable to conclude as a matter of law that the City's self-evaluation complies with 28 C.F.R. § 35.105. The City is correct that the regulation does not require duplication of the self-evaluation conducted by the City for purposes of complying with § 504 of the Rehabilitation Act. On the other hand, the regulation does not permit a public entity to rely *solely* on its § 504 evaluation to meet the ADA's requirement for a self-evaluation. Indeed, § 35.105(d) explicitly provides that the self-evaluation requirement applies only to those policies and practices that were not included in the previous self-evaluation. The language of the regulation clearly recognizes that the scope of the ADA self-evaluation is broader than that required by § 504.[10] Yet, the City's ADA self-evaluation appears to be nothing more than the previous self-evaluation conducted in 1984 for purposes of complying with § 504, with the addition of two new pages which essentially do nothing more than assert that the City will comply with the ADA.

Indeed, the great bulk of the documents included within the City's exhibit labelled "self-evaluation plan" are in fact exact duplicates of documents prepared in 1984. The regulation upon which the City relies, however, explicitly provides that the ADA self-evaluation requirement applies only to policies and practices *not included* in the previous self-evaluation. Only the first two pages of the exhibit appear to have been newly generated for purposes of meeting the ADA self-evaluation requirement. The court would be hard pressed to conclude that these two pages alone reflect a good faith intent on the part of the City to carry out the type of self-evaluation envisioned by the ADA regulations. One of the two pages is a statement of the City's policy against discriminating on

---

9. *See* 28 C.F.R. § 41.57(c) (transition plan under § 504).

10. For example, § 504 applies only to programs or activities that are recipients of federal finan-

cial assistance. *See* 29 U.S.C. § 794; 29 C.F.R. § 41.51(a). The ADA, on the other hand, applies to all *services,* programs, or activities of a public entity, whether supported by federal financial assistance or not. *See* 42 U.S.C. § 12132.

the basis of disability. While the court finds this policy completely consistent with the ADA, a statement of anti-discrimination policy is not the same as an evaluation of the extent to which current services, policies, and practices do not or may not meet the requirements of Title II and its implementing regulations.

■ The City's reply brief states that its ADA policy allows for a "day-to-day evaluation of programs and activities and the flexibility to modify or move programs that are or may become inaccessible under individual circumstances." However, the Title II implementing regulations clearly call for the City to conduct a comprehensive self-evaluation within one year of the effective date of the regulations. Further, to the extent the City elects to comply with the ADA's accessibility mandate by making structural modifications to existing facilities, the regulations require the City to adopt a specific transition plan by July 26, 1992, showing specifically how the City plans to achieve such compliance. In short, the regulations promulgated by the Department of Justice to enforce Title II do not permit the City to exercise a "day-to-day evaluation;" nor do they afford the City the "flexibility" to make modifications of programs that "are or may become inaccessible" on a case-by-case basis. Rather, the regulations impose an affirmative duty on the City to ensure its services, programs, and activities are accessible to those with disabilities. The City is required by the regulations to conduct a self-evaluation to identify compliance deficiencies, and proceed to correct those deficiencies whether or not a particular qualified individual with disabilities is presently excluded from access by such deficiencies.

The City's 1984 self-evaluation appears to have comprehensively reviewed the accessibility of city buildings and facilities as of 1984, and at least some programs and activities that were recipients of federal funds in 1984. However, it is a disputed issue of fact whether the ADA self-evaluation addressed *all* of the City's *current* services, policies, and practices, and the effects thereof, to determine the degree of their compliance

with the ADA. This is the explicit requirement of 28 C.F.R. § 35.105(a).

In promulgating the ADA regulations, the Department of Justice elaborated on the intent of the self-evaluation requirement as follows:

Section 35.105 establishes a requirement, based on the section 504 regulations for federally assisted and federally conducted programs, that a public entity evaluate its *current* policies and practices to identify and correct any that are not consistent with the requirements of this part.....

Experience has demonstrated the self-evaluation process to be a valuable means of establishing a working relationship with individuals with disabilities, which has promoted both effective and efficient implementation of section 504. The Department expects that it will likewise be useful to public entities newly covered by the ADA.

. . . .

Paragraph (d) provides that the self-evaluation required by this section shall apply only to *programs not subject to section 504 or those policies and practices, such as those involving communications access, that have not already been included in a self-evaluation required under an existing regulation implementing section 504.* Because most self-evaluations were done from five to twelve years ago, however, the Department expects that a great many public entities will be reexamining all of their policies and programs. Programs and functions may have changed, and actions that were supposed to have been taken to comply with section 504 may not have been fully implemented or may no longer be effective. In addition, there have been statutory amendments to section 504 which have changed the coverage of section 504, particularly the Civil Rights Restoration Act of 1987, Public Law No. 100–259, 102 Stat. 28 (1988), which broadened the definition of a covered "program or activity." [11]

28 C.F.R. Pt. 35, App. A, Section 35.105 (preamble to final regulation on nondiscrimination on the basis of disability in State and local government services) (emphasis added).

---

**11.** *See* 29 U.S.C. § 794(b) (defining "program or activity" for purposes of § 504).

Because the City's ADA self-evaluation appears to rely almost exclusively on the self-evaluation conducted in 1984 for purposes of compliance with § 504, the court cannot conclude that the City is entitled to judgment as a matter of law on plaintiff's claim that the self-evaluation falls short of compliance with 28 C.F.R. § 35.105.

Count I of the complaint also challenges the adequacy of the transition plan adopted by the City for the purpose of complying with 28 C.F.R. § 35.150(d), with regard to the accessibility of existing facilities. The court has carefully reviewed the City's transition plan, which has been submitted as an exhibit to the City's motion for summary judgment. The plan includes a preprinted one-page form for each of several city buildings and facilities, such as City Hall and the public library, which includes a listing of the structural changes to the facility deemed necessary in order to achieve accessibility. An additional preprinted form in the plan designates a need for "[c]urb ramps as required throughout the community with priority given to those sidewalks serving public facilities and public accommodations." On each form, the City has indicated that the proposed modifications have been "[i]ncluded in CDBG [Community Development Block] Grant for possible funding after August 1992."[12] The only other item included in the transition plan is a city map showing the locations of each facility designated for improvements.

■ The City contends in its motion for summary judgment that the transition plan meets the minimum requirements of 28 C.F.R. § 35.150(d). The court disagrees. The plan does not include a schedule for providing curb ramps in accordance with the priorities forth in § 35.150(d)(2), but merely echoes the language of the regulation that "priority" will be given to curb ramps on walkways serving public facilities and accommodations. Nor does the plan comply with the minimum requirements explicitly set forth in § 35.150(d)(3). The plan does not identify existing physical barriers but simply indicates generally the parts of the listed facilities that need to be modified or added.[13] The plan does not describe "in detail" the methods to be used to make the facilities accessible.[14] Nor does it specify a schedule for taking the necessary steps to make the facilities accessible.[15] Finally, the transition plan itself does not designate the official responsible for implementation of the transition plan.[16] Consequently, the court must

12. On the page indicating a need to create curb ramps, there is an indication that general city revenues might support construction costs. However, this statement is entered under the heading of "Applicable UFAS or ADAAG standard," and therefore the intended meaning of the reference to general revenue funding is unclear.

13. For example, on the page for the city zoo, the following entry appears under the heading "Necessary structural changes (list features and how each is inaccessible):"

"Modify or add within this facility:
Entry Gate
Restrooms
Drinking Fountain
Lower Tier Ramping."

14. In its reply, the City admits the plan does not set forth specific details regarding the methods to be used to remove identified physical obstacles, but argues that the plan leaves those details to the engineering firm engaged to complete the necessary modifications. The court notes, however, that the regulations require *the City* to adopt a transition plan, including such details, on or before July 26, 1992. The two bid documents submitted by the defendant with its reply provide additional details as to planned modifications, but those details were not set forth in the transition plan adopted prior to July 26, 1992, and are not readily available to the public as a part of the plan, which is required by 29 C.F.R. § 35.150(d)(1), (3)(ii). Hence, the bid documents, respectively dated August 16, 1993 and December 1, 1993, cannot be considered by this court in determining whether the City's transition plan complies with the Title II implementing regulations.

15. 28 C.F.R. § 35.150(d)(3)(iii) specifically provides that if the period of the transition plan exceeds one year, the plan must identify which steps will be taken during *each year* of the multi-year transition period. The City's transition plan makes no attempt to do so, although the City argues that it has three years, until January 26, 1995, to implement the modifications listed in the transition plan.

16. Although the parties do not dispute that the City has designated Ron Fehr as the person to be contacted regarding the administration of the transition plan, neither he nor anyone else is designated in the plan document as the official responsible for its implementation, as specifically required by 28 C.F.R. § 35.151(d)(3)(iv).

deny the City's motion for summary judgment on the plaintiff's claim that the transition plan fails to comply with the requirements of the ADA regulations, in particular 28 C.F.R. § 35.150(d).[17]

Next, the City argues it is entitled to summary judgment with regard to Count II of plaintiff's complaint. Count II alleges that the City subjected plaintiff to discrimination in a variety of ways in violation of Title II of the ADA. Specifically, the plaintiff argues that he has been excluded from attending City Commission meetings, from participation in developing the ADA self-evaluation and the ADA transition plan, from filing grievances and complaints with the City, and from recreational events sponsored by the City's parks and recreation department. He argues that his access to such programs, activities, and services is barred because of physical barriers, and because alternative media are not available for filing complaints with the City.

■ Plaintiff's claim in Count II essentially alleges violations of 42 U.S.C. § 12132, which generally prohibits a public entity from excluding a qualified individual with a disability from services, programs, or activities of the public entity. *See also* 28 C.F.R. § 35.130(a) (same). To establish a violation of Title II, plaintiff must show:

(1) that he is a qualified individual with a disability;

(2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and

(3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability. *Concerned Parents to Save Dreher Park Center v. City of West Palm Beach,* 846 F.Supp. 986, 989–90 (S.D.Fla. 1994).

■ With regard to the claim that he has been excluded from City Commission meetings, the parties do not dispute that plaintiff was physically unable to attend one meeting of the City Commission in November 1992, because the elevator accessing the second floor of City Hall was not functioning at the time. The parties agree that the Commission, aware that the elevator was not working, altered its agenda for that meeting to defer certain agenda items to a subsequent meeting, which the plaintiff attended. Nevertheless, the plaintiff was excluded by virtue of his disability from a public meeting of City officials, clearly within the ambit of Title II of the ADA.[18] The court is therefore unable to conclude that the defendant is entitled to summary judgment on the plaintiff's claim that the City has violated the ADA by excluding him from attending a City Commission meeting on the basis of his disability.

■ The City next contends that the plaintiff was not excluded from participating in the development of the self-evaluation and the transition plan. In response, plaintiff appears to argue that the City has denied plaintiff the ability to participate equally in city activities because it has failed to provide auxiliary communication aids as required by 28 C.F.R. § 35.160(b)(1).

■ The court notes that the pretrial order does not preserve under Count II a claim that the City has violated 28 C.F.R. § 35.160

---

17. Plaintiff also contends that the self-evaluation and the transition plan do not comply with the ADA and its implementing regulations because the documents do not address whether the City communicates by alternative media and because the City does not offer access to the documents themselves by alternative media. Plaintiff also contends that the self-evaluation and transition plan do not include buildings leased by the City, and that the City has failed to comply with the requirements of 28 C.F.R. § 35.105(c) with regard to the self-evaluation.

Because the court has determined that the City is not entitled to summary judgment on Count I for other reasons, it is not necessary to address each of these arguments at this time.

18. The City has not explained why it proceeded with part of its agenda notwithstanding its awareness that the meeting was inaccessible to the plaintiff. Nor has the City explained why the City Commission could not have held its meeting at another location in City Hall that would not have required elevator access. The City argues in its reply that "an isolated elevator malfunction is not an ADA violation." Plaintiff, however, does not claim that the malfunctioning elevator amounted to a violation of the ADA, but rather that his exclusion from participation in a City Commission meeting as a result of his disability violated the ADA.

by failing to provide auxiliary communications aids to the plaintiff, except to the extent that the plaintiff has been barred from filing complaints with the City.[19] The pretrial order does claim that the plaintiff has been excluded from participating in preparation of the self-evaluation and transition plan. However, the plaintiff has not controverted the City's assertion that the plaintiff participated and attended virtually all of the ADA Committee meetings held by the City, except those held while the plaintiff was recovering from a broken hip and broken arm. Plaintiff has also admitted that he was able to participate and did participate in every ADA Committee meeting he could. Because the plaintiff has not shown the court that there exists a genuine issue of disputed fact with regard to his claim that he was excluded from participating in the development of the self-evaluation and the transition plan, the court will grant partial summary judgment to the City with regard to this aspect of plaintiff's claim.

■ The City next argues that the plaintiff has not been excluded from attendance at city-sponsored recreational events. Plaintiff claims that physical barriers in existing recreational facilities deny him equal access to recreational events. The defendant argues in its summary judgment motion that the regulations give the City until January 26, 1995, to make structural modifications in existing facilities, and therefore this issue is not ripe for determination. In response, the plaintiff argues that the ADA requires the City to make such activities accessible after the effective date of the ADA, January 26, 1992. The plaintiff agrees that the regulations do not require the City to make structural modifications in existing facilities until January 26, 1995, but argues that the City nevertheless has an obligation in the meantime to make its recreational activities accessible by alternative means, such as moving the activity to another location that is accessible to the plaintiff.

The plaintiff's argument has merit. The ADA and its prohibitions against discrimination generally went into effect 18 months after enactment, or January 26, 1992. Pub.L. 101–336, Title II, § 205(a), 104 Stat. 337 (enacted July 26, 1990). The implementing regulations in 28 C.F.R. Part 35 provide public entities with various avenues for achieving compliance with the ADA, such as constructing new facilities, modifying existing facilities, or altering the location or means of delivery of city services, activities, and programs. The self-evaluation requirement of the regulations specifically directs public entities to "proceed to make the necessary modifications" in its services, policies, and practices in order to achieve compliance with Title II implementing regulations. 28 C.F.R. § 35.105(a). If the City's self-evaluation and planning process concludes that structural modifications in existing facilities are necessary to achieve compliance, the regulations dictate that such modifications must be made by January 26, 1995, "but in any event as expeditiously as possible." 28 C.F.R. § 35.-150(c). Nevertheless, compliance with the ADA itself is required effective January 26, 1992. A public entity is subject to claims of discrimination at any time after that date,

19. Under Count II, plaintiff alleges that the City has failed to adopt a procedure for filing complaints that does not discriminate against persons with disabilities. Specifically, he argues that the City has an obligation to accept complaints in alternative media, to offer information on the complaint process in alternative media, and to remove physical barriers denying him access to the grievance process. In making this claim, plaintiff is apparently relying upon 28 C.F.R. § 35.107(b), which requires a public entity employing 50 or more persons to adopt and publish grievance procedures to address complaints alleging violations of Title II and its implementing regulations. In addition, § 35.106 requires a public entity to make information available "in such manner as the head of the entity finds necessary" to apprise interested persons of the protections afforded by the ADA.

Finally, § 35.160 requires the entity to ensure that communications to persons with disabilities are as effective as those with others.

In its summary judgment motion, the City does not specifically address plaintiff's claim that he has been effectively denied access to the City's ADA grievance process. After reviewing the record, the court concludes that there is a genuine issue of material fact with regard to whether plaintiff was denied access to the grievance process. The plaintiff does not dispute the City's assertions that a grievance form has been adopted for this purpose and that the plaintiff never filed an ADA grievance. However, plaintiff contends that he tried to file a grievance but was unable to do so. Therefore, to the extent that the City seeks summary judgment on this claim, its motion must be denied.

even if the entity has not yet completed the self-evaluation during the one-year period provided by 28 C.F.R. § 35.105(a). *See* 28 C.F.R. Pt. 35, App. A, Section 35.105, ¶ 5. If the time for completing the self-evaluation does not stay the effective date of the statute, it would be inconsistent to hold that a public entity may extend by as much as three years the time for complying with its statutory obligation to ensure program accessibility, simply by deciding to continue offering those programs in existing, inaccessible facilities.[20]

■ For this reason, the court cannot conclude that the City is entitled to judgment as a matter of law solely on the basis that 28 C.F.R. § 35.150(c) permits the city an extension until January 26, 1995, at the latest,[21] in which to make structural modifications to its existing facilities. The City must comply with the ADA's prohibition against discrimination notwithstanding the fact that the maximum time permitted for making structural modifications in existing facilities has not yet expired.[22]

■ The City next argues that plaintiff cannot prevail on Count III of his complaint, as a matter of law. Count III alleges that the City has entered into licensing and contractual arrangements with local businesses in violation of 28 C.F.R. § 35.130(b)(1). Specifically, the plaintiff argues that the City knowingly issues liquor licenses and building permits for facilities that are not accessible to persons with disabilities. As a result, plaintiff alleges that he has been denied access to services, activities, and programs offered either by the City or by facilities licensed by the City, in particular eating and drinking establishments and liquor stores. Further, plaintiff contends that the City fails to evaluate its licensees for compliance with the ADA, and has failed to require ADA compliance as a condition for licensure.[23]

In seeking summary judgment on Count III, the City correctly argues that the regulations implementing Title II of the ADA do not cover the programs and activities of entities that are licensed or certified by a public entity. *See* 28 C.F.R. § 35.130(b)(6). Although *City programs* operated under contractual or licensing arrangements may not discriminate against qualified individuals with disabilities, *see* 28 C.F.R. § 35.130(b)(1), "[t]he programs or activities of licensees or certified entities are not themselves programs or activities of the public entity merely by virtue of the license or certificate." [24]

---

**20.** This interpretation is consistent with the court's duty to construe remedial legislation liberally to effectuate its purpose. *See Kinney v. Yerusalim,* 812 F.Supp. at 551 (ADA is remedial statute designed to eliminate discrimination against the disabled in all facets of society, and as such must be construed liberally) (citing *Tcherepnin v. Knight,* 389 U.S. 332, 335, 88 S.Ct. 548, 552–53, 19 L.Ed.2d 564 (1967)).

**21.** The court reiterates that the regulation requires a public entity to make such structural modifications in existing facilities "within three years of January 26, 1992, *but in any event as expeditiously as possible.*" (Emphasis added.) As the court interprets the regulation, the mandate to accomplish the necessary modifications as expeditiously as possible is controlling, but such changes absolutely must be accomplished no later than January 26, 1995.

**22.** The court notes that the City has asserted an affirmative defense under 28 C.F.R. § 35.-150(a)(3) on the basis that the required action would result in undue hardship. Pretrial Order, at 8. The defendant's motion for summary judgment, however, does not rely on this argument. Even if it had, this defense would presumably raise an issue of disputed fact that would preclude summary judgment.

**23.** Pretrial Order, at 6–7.

**24.** For example, a concessionaire operating in a city park under a contractual arrangement with the city might be considered a city service. However, a licensed food service establishment operating on private property would not be considered a city service, activity, or program just because the city granted it a license to conduct its food service business.

In *Indep. Housing Services v. Fillmore Center Associates,* 840 F.Supp. 1328 (N.D.Cal.1993), the court denied summary judgment to a city redevelopment agency on the plaintiff's claim that the agency's provision of bond financing to the owner of a housing project violates the ADA if the housing project discriminates against disabled persons. The court noted the "crucial distinction" that the agency had *contracted* with the owner of the housing project to provide aid, benefits, or services to beneficiaries of the agency's urban renewal program. *Id.* at 1344. In this case, the City has not contracted with any establishment licensed to sell or serve liquor for the purpose of providing any kind of government service or benefit to those who frequent such establishments.

*See* 28 C.F.R. Pt. 35, App. A, Section 35.130 (reference to paragraph (b)(6)). Therefore, except to the extent that plaintiff asserts in Count III that he has been denied access to services, aids, and programs *provided by the City* under licensing or contractual arrangements, *see* 28 C.F.R. § 35.130(a), (b)(1), the defendant is entitled to judgment as a matter of law on Count III.

■ In response to the City's motion for summary judgment, the plaintiff contends that the City provides a service to the non-disabled public by physically inspecting licensed facilities. If those facilities are not accessible to persons with disabilities, he argues, the City's inspection service and the accompanying safety benefits are not available equally to persons with disabilities. While that may be true, individuals with disabilities are not denied access to such licensed facilities, or to the claimed benefits flowing from the City's inspection of them, by virtue of any act of the City in the manner it conducts those activities. Rather, they are excluded from the benefits of the City's inspection and licensing services solely because the licensed structure itself happens to be inaccessible. Title II of the ADA and its implementing regulations prohibit discrimination against qualified individuals only *by public entities.* *See* 28 C.F.R. § 35.102(a); § 35.130(a). It simply does not go so far as to require public entities to impose on private establishments, as a condition of licensure, a requirement that they make their facilities physically accessible to persons with disabilities.

The plaintiff has not asserted any facts in his response showing that a genuine issue of material fact exists with regard to Count III of his complaint. He relies solely on the argument that the City licenses inaccessible restaurants, vendors of cereal malt beverages, and liquor stores. As previously discussed, such facilities are not "services, programs, or activities of a public entity" under the ADA and hence are not covered by Title II or by the implementing regulations. The City is therefore entitled to summary judgment on Count III.

**IT IS BY THE COURT THEREFORE ORDERED** that the defendant's motion for summary judgment (Doc. 28) is granted in part and denied in part.

**IT IS FURTHER ORDERED** that the plaintiff's cross-motion for summary judgment (Doc. 31) is denied.